JOHNSON *v.* MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY CO.

RAILROADS — NEGLIGENCE — PERSONAL INJURIES — CONTRIBUTORY NEGLIGENCE.

> Where the mill yard in which plaintiff worked was, upon stated and uniformly recurring occasions, given up to the business of moving cars on the tracks which it contained, and on such occasions plaintiff was permitted, and had been directed by his employer, to cease work until the switching was completed, and on one of such occasions, while he knew switching was in progress, he voluntarily assumed a manifestly dangerous position, and was hurt by a moving car, his own negligence was the cause of the injury and the railroad company is not liable.

Error to Schoolcraft; Steere, J. Submitted April 12, 1905. (Docket No. 54.) Decided May 22, 1905.

Case by Ellis Johnson, by his next friend, against the Minneapolis, St. Paul & Sault Ste. Marie Railway Company for personal injuries. There was judgment for plaintiff, and defendant brings error. Reversed.

*A. H. Bright* and *C. W. Dunton,* for appellant.

*Virgil I. Hixson* and *Warner & Sullivan,* for appellee.

OSTRANDER, J. Plaintiff was an employé of the White Marble Lime Company at Manistique, and had been for a period of six weeks. The sawmill of the White Marble Lime Company is situated north of the main line of defendant, and to the north of the mill; and parallel with its northern side, upon the land of the mill company, are two spur tracks, to secure which this company had, by agreement with defendant, graded the land and furnished ties, the railroad company furnishing the steel. No one could

use the tracks without permission of the White Marble Lime Company, but the defendant had permission to store cars there when the mill was not in operation. The White Marble Lime Company also had property south of the main line of defendant, and the arrangement between the two companies included the switching of cars from the site north of the main line to the yard on the south side of the main line, as well as to the main line of defendant's road. Directly to the west of the sawmill is a river, and the two spur tracks mentioned run to the bank of the river, upon which, at the end of the tracks, bumpers or stopping posts are built. These spur tracks are about 500 feet long, and run nearly in straight lines from the switch to the river. To summon the switch engine and its crew, the engineer or foreman of the mill blew the mill whistle, giving one hour's notice; and it was the rule and custom for switching to be done on these spur tracks twice a day, in the forenoon and in the afternoon. Upon the appearance of the switch engine and its crew in the yard, the foreman of the mill directed what cars were to be taken out, and the disposition to be made of empty cars or others coming in. In pushing in cars, it frequently occurred that the locomotive would bring them to the switch, or a little beyond it, and, giving them sufficient momentum, uncouple them and let them run in. It was understood by the men employed there, including plaintiff, that when switching began in the yard the work of those employed in loading and unloading cars was to cease until the work of moving the cars had been completed. It was the rule of the place that the men should stop work when switching began. This rule and this custom were known to the defendant and its employés. Upon such occasions notice was given to the men at work in and about the cars, sometimes by the mill foreman, sometimes by the train crew, and when the work of switching was completed the men were told to go to work again. Plaintiff was asked this question:

"*Q.* You did that every day, while you were working outside during those six weeks? Isn't that the way?

"*A.* Yes. * * * After the foreman told us that the switch was coming we were in the habit of looking out for ourselves until the engine had taken out the loads and put back the empties. We did that every day while I was working outside during the six weeks I worked there."

Plaintiff was injured on April 30, 1903. At the time of the accident there were cars on both the north and south spurs. A flat car loaded with shingle bolts, with posts on top of them, had been placed on the south spur track, its west end being almost directly against the bumper, or stopping post. Next to it to the east was a flat car, on which also were shingle bolts and posts; the shingle bolts being piled two or three feet high on each car. These posts had been unloaded, taken to the mill, trimmed, and reloaded into a box car. East of this second loaded flat car were other cars—one of them a box car. From four to six feet of the shingle bolts had been removed from the car next to the river by throwing them over the bumper and into the river. The little space between the end of the car and the bumper, interfering with this work, in which plaintiff and others or another had been engaged, the men concluded to place a skid from the end of the car over the bumper, so that the bolts could be more easily put into the river. A skid had been found and put in position, to be nailed to the car. Plaintiff went to the mill to get nails, brought them back, walking down between the two spur tracks, handed one or more of them to the man on the car, and, in passing him one of them, stepped around to the end of the car, between it and the bumper, or the timber nailed across the bumper, passed the nail to the man on the car, put his hands on the car, and was about to mount it, when some cars pushed in upon the spur by the switch engine struck the cars east of the one on which plaintiff had been at work with sufficient force to pinch him between the end of the car and the bumping post, causing the injury complained of.

The contention of counsel rests upon very few facts—indeed, may be said to turn upon a single undisputed fact, and the value of that fact in the case. It is undisputed that the only business to be done by the switch engine and its crew in this yard was to move out cars already there, and to move in other cars. It had no other business in the yard. It is undisputed that within a period of time not longer than 10 minutes prior to the accident the switch engine was in the yard at work, and that it pulled out cars which were upon the south track. It is undisputed that plaintiff knew that the afternoon switching had begun. He says:

"I was just handing him the second spike, and I stepped one foot on the rail to get on the flat car when I was caught. I didn't see the engine. I did not know it was. coming. * * * I knew the engine had been there ten or fifteen minutes before I got hurt. I saw the cars move. I was standing beside the car when the engine first came in. I was looking for a skid at that time. It was snowing, and the smoke from the smokestack came down to the ground between the car, and it was pretty hard to see ahead."

It was agreed by counsel that the record of the United States weather bureau kept at Manistique on that day showed the prevailing wind was from the north, and that there was a slight fall of snow, not sufficient to be measured. Plaintiff further testified:

"When I knew there was switching, I stopped work. The engine came in every day. We were loading cars every day, and the loaded cars were taken out, and empties put in. When the engine came in after loads, I knew it would afterwards put in the empties. I knew that if it took out loads it would have to put empties back. All the loading would have to stop until the switching was done. I knew the engine came in ten or fifteen minutes before I was hurt. The smoke was coming down from the smokestack, and it was snowing so I couldn't see up the track when I was hurt. I didn't know the engine was coming back when I got hurt. I knew when the engine came in ten minutes before I was hurt.

"The engine generally came in once in the morning and once in the afternoon. I was in the postmill when it came in the forenoon. I knew it was there ten minutes before I was hurt. I did not know it had not been there before that time. The first I knew of its being there that afternoon was ten minutes before I got hurt."

No notice had been given to the men to resume work. Counsel for plaintiff say that the evidence shows that no whistle was blown by the switch engine on the afternoon in question, that there is a conflict of testimony concerning the fact of ringing the locomotive bell, and that there is a dispute as to whether the foreman gave the men warning of the presence of the switch engine in the yard. He also relies upon plaintiff's testimony to the effect that he did not know that the engine had that afternoon, and at the time he knew that it was in the yard, taken out any loaded cars; that plaintiff did know that a loaded car or loaded cars directly east of where he was working were not taken out before he was injured; that it was usual— he says it was a universal custom—up to the time of the accident, that when the engine came in first it took out *all* the loaded cars, and then a few minutes later it switched in the empties; that it was the universal custom for the foreman to give personal warning to the men engaged in loading or unloading cars before switching was done; that, if such warning was given upon the occasion in question, it was not heard by the plaintiff, and it is disputed that any such warning was given at all, although the foreman testified to having given it; that, under the circumstances, the fact that plaintiff knew that 10 minutes before he was hurt the switch engine was in the yard is not controlling as to plaintiff's negligence; that he had, notwithstanding, the right to expect some other or further warning or notice of danger. In this argument, we think counsel rely upon the manner in which some of the testimony is phrased rather than upon the real facts disclosed. Too much significance is given to the alleged practice of taking out *loaded*, and later bringing in *empty*, cars. The cars put upon these spur tracks were not all of them empty cars,

since plaintiff was engaged in unloading cars which had been brought in there. Nor does it appear that it was a universal practice for the mill foreman to tell the men that switching had commenced. The witness Wyckman, sworn for plaintiff, who was nailing the skid to the car, and to whom plaintiff handed the nail, testified:

"The cars had been moved. They were in there switching a few minutes—about ten or fifteen minutes—before he was hurt. We were unloading the cars at that time."

This witness also testified:

"I asked Johnson for a bigger nail, and he went into the mill to get a nail. He was gone only a minute or so. * * * When Johnson came from the mill, he came down between the two tracks to where I was, and stepped on the rail between the stop block and the car, and handed me the nail, and just at this same time the engine struck into the cars and jammed him in there."

Another witness, sworn for the plaintiff, testified that he was loading shingles into the sixth car from the river, and started to load about half an hour before the accident; that the switch engine came in there and hit the car just as he was going into the car with a bunch of shingles, and that the car moved; that this was about 10 or 15 minutes before the accident.

"It struck the car, and it moved so I could not get the shingles into the car. I waited for the foreman to come and tell me to do something else. I waited ten or fifteen minutes, and then the engine came back again, and we didn't know anything about it, and at this time Johnson got pinched."

A witness called for plaintiff (the one who stood by the side of the car when he got hurt) testified:

"I know the switch engine was in before Johnson got hurt, but I don't know if it pulled out any loads. It was on the track on which we were working. It was ten or fifteen minutes before the accident. I think they were a little longer this time in switching than usual. Some days it would take longer to switch than other days. I believe they pulled out some loaded cars that day from that track, and just before the accident. I saw the engine when it

came in, but did not pay any attention to it. We three were there on the track unloading at the time the engine first came in, and remained there until Johnson was hurt. * * * We three were working there together when the switch engine came in and took out about three loaded cars, and it was about ten minutes later when they switched in the empties. * * * From where Wyckman and I were standing, we could have seen what was going on where they were switching the cars; but we were working with our backs toward the east and our faces toward the west, and we knew nothing about what was going on until the car was struck."

Whatever warning the foreman or any other person could have given plaintiff was given him by the presence of the switch engine in the yard. That he did not notice whether or not any loaded cars were taken out does not help him. He apparently assumed the only position of danger there was at the point where he was working, since the pinching he received between the end of the car and the bumper left no external evidence of injury and fractured no bones.

We are referred to numerous decisions in cases where persons employed in, on, and around cars standing in yards were injured. We need not discuss them, nor do more than again state the fact which distinguishes this case. The yard in which plaintiff worked was, upon stated and uniformly recurring occasions, given up to the business of moving cars. On such occasions plaintiff was permitted and had been directed to cease work until switching operations were completed. On one of these occasions, notice of which and of the operations being conducted he had, while occupying voluntarily a position of danger which exercise of the most ordinary care would have prevented him from assuming, he was injured. He seeks to recover damages for the injury, and relies upon the failure of defendant to give him warning of the operations in progress.

The judgment below will be reversed, and a new trial will be granted.

Moore, C. J., and Carpenter, McAlvay, and Hooker, JJ., concurred.